******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* MATTHEW PUGH
## (AC 39688)

Lavine, Keller and Pellegrino, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of murder and burglary in the first degree, the defendant appealed. The defendant's conviction stemmed from his alleged murder of his former girlfriend in her home. At trial, the trial court admitted testimony from M, pursuant to the applicable rule of evidence (§ 8-3 [2]), concerning statements made by the victim during a telephone conversation on the day of the murder relating to the unexpected presence of the defendant, her former boyfriend, at her door. W, a Milford police detective, also testified, without objection, that, to verify the defendant's statements regarding his whereabouts on the day of the murder, he and other police investigators spoke with individuals from various car dealerships that the defendant claimed to have visited, all of whom stated that they had no recollection of the defendant visiting on that day. *Held*:

1. The trial court did not abuse its discretion by admitting, pursuant to the spontaneous utterance exception to the rule against hearsay, M's testimony regarding the statements that he overheard the victim make while they were on the telephone on the day of the murder; the record supported that court's finding that the victim's statements were made in such close connection to a startling occurrence and under such circumstances as to negate the opportunity for deliberation and fabrication, as the subject statements were spontaneous and unreflective, and made in response to the startling occurrence of the defendant's unexpected and unwanted appearance at the victim's door, the victim made the statements as the subject events unfolded, which negated the opportunity for deliberation or fabrication, M testified that the victim was annoyed and surprised when she made the statements, and there was testimony that the victim feared the defendant and that he was the only person the victim referred to as her "ex-boyfriend."

2. The defendant could not prevail on his unpreserved claim that the trial court violated his constitutional right to confrontation by admitting W's testimony regarding the defendant's alleged whereabouts on the day of the murder, which he claimed constituted inadmissible testimonial hearsay; even if the admission of the challenged testimony was improper, the state met its burden of proving that any error was harmless beyond a reasonable doubt, as the testimony was cumulative of unchallenged testimony that had been presented to the jury and was consistent with the state's theory of the case, all of which provided a firm basis for the jury to doubt the defendant's version of events on the day of the victim's murder, and the state presented a strong case against the defendant by demonstrating that he had devised a plan to kill the victim, that he was in the area of or inside her home at approximately the time of her death, and that a distinct type of tape, to which he had access, was used in connection with her murder.

3. This court found unavailing the defendant's claim that the trial court committed plain error by failing to dismiss, sua sponte, the charge of burglary in the first degree, which he alleged had been brought beyond the applicable statute of limitations: the defendant was not entitled to reversal of his burglary conviction under the plain error doctrine, as he waived a statute of limitations affirmative defense by failing to raise it at trial and, therefore, was barred from raising such a defense on appeal; furthermore, the defendant did not provide this court with any controlling authority indicating that it was the responsibility of the trial court, sua sponte, to dismiss a criminal charge that had been brought beyond the applicable statute of limitations.

Argued April 10—officially released September 19, 2017

*Procedural History*

Substitute information charging the defendant with

the crimes of murder and burglary in the first degree, brought to the Superior Court in the judicial district of Ansonia-Milford and tried to the jury before *Markle, J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Damian Gunningsmith*, with whom, on the brief, was *John L. Cordani, Jr.*, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with whom, on the brief, was *Kevin D. Lawlor*, state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The principal issue in this appeal is whether the trial court improperly admitted into evidence, under the spontaneous utterance exception to the rule against hearsay, statements made by the victim relating to the unexpected presence of her former boyfriend, the defendant Matthew Pugh, whom she feared. The defendant appeals from his conviction, following a jury trial, of murder in violation of General Statutes § 53a-54a (a) and burglary in the first degree in violation of General Statutes § 53a-101 (a) (2). On appeal, the defendant claims that the trial court: (1) abused its discretion by admitting into evidence statements made by the victim pursuant to the spontaneous utterance exception to the rule against hearsay; (2) erroneously admitted into evidence testimonial hearsay in violation of his rights under the confrontation clause of the sixth amendment to the federal constitution by permitting a police investigator to testify as to certain witness statements regarding the defendant's claimed whereabouts on the day of the murder; and (3) committed plain error when it did not dismiss, sua sponte, the burglary in the first degree charge, which had been brought beyond the applicable statute of limitations. We affirm the judgment of the trial court.

By way of long form information, the state charged the defendant with murder and burglary in the first degree. These charges stemmed from the death of Alexandra Duscay, the victim, whose body was found by her mother, Linda Duscay, in their Milford home at approximately 4:30 p.m. on May 19, 2006. An autopsy revealed that the victim died as a result of blunt force trauma and stab wounds to her head. Following the jury's verdict of guilty on both counts, the trial court sentenced the defendant to a term of imprisonment of sixty years on the murder conviction and a concurrent sentence of twenty years on the burglary conviction, for a total effective sentence of sixty years to serve. This appeal followed. Additional facts will be set forth as necessary.

I

We begin with the defendant's first claim challenging the trial court's admission of the victim's statements under the spontaneous utterance exception to the rule against hearsay. Specifically, the defendant challenges the testimony of Jermaine Morton, who testified that the victim stated, during a telephone call on May 19, 2006, that her "ex-boyfriend" was at the door and "what are you doing here? You were supposed to call first." The defendant argues that the "nonviolent" arrival of a former boyfriend is not the type of startling event that would shock and overwhelm the senses and that statements made in relation to that event are not free from the opportunity to deliberate or fabricate.[1] We

disagree.

The following additional facts, which the jury reasonably could have found, and procedural history are relevant to the resolution of the defendant's claim. The victim met the defendant when she was a teenager. The two became romantically involved, and the victim considered the defendant her boyfriend. Although the defendant was sentenced to prison in 1998, he and the victim continued to communicate with one another.

During the defendant's incarceration, however, the victim began to distance herself from him, finding the relationship stressful. She ultimately decided to end the relationship just prior to the defendant's release from prison in 2004. Soon after the defendant was released on August 6, 2004, the victim told her brother, Erik Terranova, that she feared the defendant. Nicole Williamson, a close friend of the victim, also testified that the victim even worried that the defendant might be hiding in the bushes when she returned home at night. According to family and friends, the defendant was the only individual whom the victim referred to as her "ex-boyfriend."

At approximately 12:30 p.m. on May 19, 2006, the victim, while at home in Milford, placed a call to Morton, whom she had been dating for a few weeks. At trial, the state called Morton to testify regarding the statements he overheard the victim make during this phone call. In an offer of proof made outside of the presence of the jury, Morton testified that, during their conversation, "she told me to hold on, and she said someone was at her door. I could actually hear her in the background say *what are you doing here? You were supposed to call first*. She got back on the phone. She told me not to—she would call me right back. She called me back about ten to twenty—five to twenty minutes, or whatever, and after that she didn't say anything. She just talked about—we had another regular conversation. She didn't sound hurt or she didn't sound anything like that, so I didn't take alarm of anything, so."[2] (Emphasis added.) After reviewing the written statement that he gave to police on May 19, 2006, Morton further testified that the victim informed him that her "ex-boyfriend" was the individual at the door.[3] The court asked Morton to describe the "nature" of the victim's statements, and Morton testified that the victim was "annoyed" and "surprised that [the defendant] was there."

Over the defendant's objection, the court admitted Morton's testimony recounting the victim's statements, concluding that the statements: (1) followed the startling event of an unannounced appearance of an individual; (2) related to that appearance; (3) demonstrated the victim's direct observation of the individual's appearance; and (4) were reliable because they were made under circumstances during which the declarant

did not have time to fabricate her observations.

Before we address the defendant's claim, we set forth the applicable legal principles. "An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies. . . . Among the recognized exceptions to the hearsay rule is the spontaneous utterance exception, which applies to an utterance or declaration that: (1) follows some startling occurrence; (2) refers to the occurrence; (3) is made by one having the opportunity to observe the occurrence; and (4) is made in such close connection to the occurrence and under such circumstances as to negate the opportunity for deliberation and fabrication by the declarant. . . . [T]he ultimate question is whether the utterance was spontaneous and unreflective and made under such circumstances as to indicate absence of opportunity for contrivance and misrepresentation. . . . Whether an utterance is spontaneous and made under circumstances that would preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge. . . . The trial judge exercises broad discretion in deciding this preliminary question, and that decision will not be reversed on appeal absent an unreasonable exercise of discretion." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 127–28, 763 A.2d 1 (2000); see also Conn. Code Evid. § 8-3 (2).

To be admissible as a spontaneous utterance, "[t]he event or condition must be sufficiently startling so as to produce nervous excitement in the declarant and render [the declarant's] utterances spontaneous and unreflective." (Internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 374, 908 A.2d 506 (2006); see also *Perry* v. *Haritos*, 100 Conn. 476, 483–85, 124 A. 44 (1924) (statement deemed trustworthy because it "is made under the immediate and uncontrolled domination of the senses" [internal quotation marks omitted]). In reviewing the defendant's claim, we bear in mind that "whether a statement is truly spontaneous as to fall within the spontaneous utterance exception [is] . . . reviewed with the utmost deference to the trial court's determination." *State* v. *Saucier*, 283 Conn. 207, 219, 926 A.2d 633 (2007).

It appears that the defendant is challenging both the first and fourth elements of a spontaneous utterance, namely, whether the victim's statement "followed some startling occurrence" and whether her statement was "made in such close connection to the occurrence and under such circumstances as to negate the opportunity for deliberation and fabrication by the declarant." *State* v. *Wargo*, supra, 255 Conn. 127. On the basis of our review of the record, we conclude that the trial court did not abuse its discretion by admitting Morton's testimony regarding the statements that he overheard the

victim make while on the phone.

Connecticut courts have had numerous opportunities to assess the types of "startling events" that can generate the kind of nervous excitement or uncontrolled outbursts captured by the spontaneous utterance exception to the rule against hearsay.[4] At the outset, we appreciate the fact that the unannounced presence of an individual at one's door, in and of itself, may not appear to be among the usual set of circumstances envisioned when evaluating whether a statement is, or is not, admissible as a spontaneous utterance. Although this court has previously suggested that certain events lack the "trauma necessary to negate the opportunity for deliberation and fabrication"; (internal quotation marks omitted) *State* v. *McNair*, 54 Conn. App. 807, 813, 738 A.2d 689, cert. denied, 251 Conn. 913, 739 A.2d 1249 (1999); "the application of the exception entails a uniquely fact bound inquiry." *State* v. *Westberry*, 68 Conn. App. 622, 628, 792 A.2d 154, cert. denied, 260 Conn. 923, 797 A.2d 519 (2002). Thus, whether a statement qualifies as a spontaneous utterance requires a case-by-case assessment of the particular facts and circumstances surrounding the subject statement. See, e.g., *State* v. *Kirby*, supra, 280 Conn. 375. In other words, context is crucial.

With that in mind, we conclude that the record clearly supports the trial court's finding that the victim's statements were "made in such close connection to [a startling] occurrence and under such circumstances as to negate the opportunity for deliberation and fabrication . . . ." *State* v. *Wargo*, supra, 255 Conn. 127. At the time that the state proffered Morton's testimony, the state presented ample evidence from the victim's family that the victim feared the defendant. Her close friend, Williamson, testified that the victim was concerned that the defendant might be hiding in the bushes when she returned home. Morton also described the victim as being "annoyed" and "surprised" when she made the subject statements. Under the circumstances of the present case, the trial court did not abuse its discretion by concluding that the defendant's unexpected and unwanted appearance at the victim's doorstep startled her.[5]

Additionally, the court heard testimony that the defendant was the only person the victim referred to as her "ex-boyfriend," and the victim made these statements as the defendant was at her door. Thus, the record supports a finding that the victim made these statements as events unfolded, negating the opportunity to deliberate or fabricate. See *State* v. *Silver*, 126 Conn. App. 522, 526, 535–36, 12 A.3d 1014 (declarant's recorded statement to 911 dispatcher made as he observed erratic driver crash into center median and flee), cert. denied, 300 Conn. 931, 17 A.3d 68 (2011); *State* v. *Torelli*, 103 Conn. App. 646, 662, 931 A.2d 337

(2007) (declarant startled by erratic driver and his statements "were made in the course of an ongoing urgent situation").

We conclude that the court did not abuse its discretion in determining that the victim's statements were spontaneous, unreflective, and made in response to a startling occurrence that overwhelmed her senses.[6]

## II

The defendant next claims that the court violated his right to confrontation under the sixth amendment to the federal constitution when it admitted testimonial hearsay into evidence.[7] More specifically, he argues that the testimony of a detective from the Milford Police Department (department) was inadmissible testimonial hearsay under *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The state argues that the record is inadequate to determine whether the hearsay statements were testimonial in nature and that, regardless, any error in admitting the challenged testimony was harmless beyond a reasonable doubt.[8] Because we agree that the error, if any, was harmless, we need not address the state's argument that the record is inadequate to review the defendant's claim.

The following facts, which the jury reasonably could have found, and procedural history are relevant to the defendant's claim. After his release from prison in 2004, the defendant began a romantic relationship with Charise Trotman. The defendant lived with Trotman and her teenaged daughter, Chamira Trotman-Adams, in Hamden on May 19, 2006.

During their inquiry into the circumstances of the victim's death, investigators from the department questioned the defendant about his whereabouts on May 19, 2006. The investigators first questioned the defendant at approximately 5:30 p.m. that evening. In response to their questions, the defendant said that he had been at Chromalloy, his place of employment, all day and denied visiting Milford that day. He later informed the investigators that he left Chromalloy early to check on Adams, who had been suspended from school, arrived home just before 10 a.m., lifted weights until about 11 a.m., and then went car shopping around the greater Hamden, New Haven, and Milford vicinities. Although Adams was at home in Hamden when the defendant claimed to have returned, she did not see or hear him.

The state called Steven Wydra, a detective in the department, during its case-in-chief to testify regarding the investigation of the victim's murder. According to Wydra, his team visited various car dealerships and used car lots in the Hamden and New Haven areas, noting that "[e]veryone we talked to at the car dealerships said that they had no recollection of someone matching [the defendant's] description [visiting on May 19, 2006]." The state did not call as witnesses the individ-

uals at the car dealerships. Wydra later confirmed the substance of this testimony in response to questions posed by the state regarding a follow-up interview with the defendant that took place on May 26, 2006. Shortly after Wydra testified regarding his discussions with the individuals at the car dealerships, the following exchange took place:

"[The Prosecutor]: Did you also speak with [the defendant] regarding the used car lots that he had been visiting that afternoon?

"[Wydra]: Yes. I had explained to him that *we had gone to these car lots and they said that they had not seen him*. So I asked him again—actually, I asked if he would actually go with us to the car lots and *show us which car lots because there were like three or four of them on the corners that he talked about.*

"[The Prosecutor]: So did he assist you in doing that? Did he bring you out and say hey, this is where I was?

"[Wydra]: No, he did not." (Emphasis added.)

On appeal, the defendant claims that admitting Wydra's testimony that "[e]veryone we talked to at the car dealerships said that they had no recollection of someone matching [the defendant's] description [visiting on May 19, 2006]" violated his right to confrontation. The defendant concedes that he did not object to the introduction of the challenged testimony and, therefore, seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified in *In re Yasiel R.*, 317 Conn. 773, 780–81, 120 A.3d 1188 (2015). "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

Even if we assume, which we do not, that a violation of the defendant's right to confrontation exists on this record based on the challenged portion of Wydra's testimony, we conclude that the state has met its burden of proving that any error was harmless beyond a reasonable doubt. "It is well established that a violation of the defendant's right to confront witnesses is subject to harmless error analysis . . . . The state bears the burden of proving that the error is harmless beyond a

reasonable doubt. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, *whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points*, the extent of cross-examination otherwise permitted, and, of course, *the overall strength of the prosecution's case.* . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Smith*, 289 Conn. 598, 628, 960 A.2d 933 (2008). "[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond *all* possible doubt . . . ." (Emphasis in original; internal quotation marks omitted.) *State* v. *Sinclair*, 173 Conn. App. 1, 10, 162 A.3d 43, cert. granted on other grounds, 326 Conn. 904,      A.3d      (2017).

The jury reasonably could have found the following relevant facts. While investigating the crime scene on May 19, 2006, investigators observed black tape on the victim's face. Frank Gall, a detective from the department, determined that a company named "Permacel" manufactured the tape found on the victim's face, and described it as being "somewhat out of the ordinary." Notably, Chromalloy used Permacel tape due to its durable qualities. Tests by forensic trace evidence experts also revealed that the tape on the victim's face possessed "similar physical and instrumental characteristics" to tape seized from the defendant's residence on May 26, 2006. Of particular significance, prior to the victim's death, the defendant informed his cousin, Anthony Pugh, that he "wanted to kill [the victim]" and planned to use tape and other "stuff from work" so that there would be no evidence left behind.

The state introduced evidence of the defendant's whereabouts prior to the victim's death. Andrew Weaver, a sergeant from the Hartford Police Department, testified for the state regarding "call data record mapping."[9] Using cell phone data from the defendant's phone records on May 19, 2006, Weaver determined that the defendant was in close proximity to the victim's Milford home hours before her mother found her body. Additionally, Michael Shuckerow, a neighbor of the victim at the time of her death, testified that he saw a vehicle similar to one owned by the defendant parked on the victim's street and driving near her address on May 18 and 19, 2006, between 12 p.m. and 2 p.m. on both days. Shuckerow also made an in-court identification of the defendant as the individual operating the vehicle that he observed. Nicholas Yang, a forensic science examiner, also testified as a witness for the state regarding certain DNA evidence taken from the crime scene.

Yang testified that the DNA evidence collected from the bathroom sink and toilet in the victim's home was either consistent with the defendant's DNA profile, or that his DNA profile could not be eliminated as a contributor.

On the basis of our review of the record, we conclude that the challenged testimony was cumulative of Wydra's subsequent testimony and also corroborated other testimony presented to the jury.[10] The *sole* testimony that the defendant claims violated his right to confrontation is Wydra's statement that "[e]veryone we talked to at the car dealerships said that they had no recollection of someone matching [the defendant's] description [visiting on May 19, 2006]." The defendant does not challenge Wydra's testimony that "I had explained to [the defendant] that *we had gone to these car lots and they said that they had not seen him.*" (Emphasis added.) The challenged testimony is thus essentially cumulative of unchallenged testimony before the jury. Additionally, Wydra's testimony was consistent with the state's theory of the case and the testimony of Adams, Weaver, and Shuckerow, all of which provided a firm basis for the jury to doubt the defendant's version of events on May 19, 2006.

Finally, the state presented a strong case against the defendant, even if some of the evidence was circumstantial. See, e.g., *State* v. *Edwards*, 325 Conn. 97, 137, 156 A.3d 506 (2017) ("[i]t is immaterial to the probative force of the evidence that it consists, in whole or in part, of circumstantial rather than direct evidence" [internal quotation marks omitted]). Because the victim's autopsy revealed that she died as a result of multiple stab wounds and blunt trauma to her head, the critical issue for the state was to establish the identity of the perpetrator. The state presented a strong case identifying the defendant as the perpetrator by demonstrating that he devised a plan to kill the victim, that he was in the area of or inside her home at approximately the time of her death, and that a distinct type of tape, to which he had access, was used in connection with her death.[11]

Having reviewed the record in its entirety, we conclude that Wydra's testimony that "[e]veryone we talked to at the car dealerships said that they had no recollection of someone matching [the defendant's] description [visiting on May 19, 2006]" had no discernible effect on the outcome of the trial. This testimony was largely cumulative, not essential to the state's case, and paled in comparison to other evidence connecting the defendant to the victim's murder. We conclude that any impropriety in admitting the challenged testimony was harmless beyond a reasonable doubt, and, accordingly, the defendant's claim fails under the fourth prong of *Golding*.

III

The defendant's final claim is that the trial court committed plain error when it did not dismiss, sua sponte, the burglary in the first degree charge, which had been brought beyond the applicable statute of limitations. In response, the state argues that the statute of limitations is an affirmative defense that must be pleaded and proven by the defendant at trial. We agree with the state.

The following facts and procedural history are relevant to this claim. The charge of burglary in the first degree stemmed from the victim's murder on May 19, 2006. A warrant for the defendant's arrest issued on August 24, 2012, and the defendant was arrested on September 5, 2012. Because burglary in the first degree is a class B felony, the five year statute of limitations applied and the charge against the defendant should have been brought by May 19, 2011. See General Statutes §§ 53a-35a (6), 53a-101 (c), and 54-193 (b).[12]

"[An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis in original; internal quotation marks omitted.) *State* v. *McClain*, 324 Conn. 802, 812, 155 A.3d 209 (2017); see Practice Book § 60-5. Moreover, "a clear and obvious mistake on the part of the trial court is a prerequisite for reversal under the plain error doctrine . . . ." *State* v. *Coward*, 292 Conn. 296, 307, 972 A.2d 691 (2009).

The defendant concedes that he did not raise at trial a statute of limitations defense to the burglary in the first degree charge. Having failed to assert this defense at trial, the defendant is deemed to have waived such defense and is, therefore, barred from raising it on appeal. See, e.g., *State* v. *Coleman*, 48 Conn. App. 260, 268–69, 709 A.2d 590 (1998) (defendant waived statute of limitations defense by not raising it at trial and, therefore, defendant barred from raising it on appeal), aff'd, 251 Conn. 249, 741 A.2d 1 (1999), cert. denied, 529 U.S. 1061, 120 S. Ct. 1570, 146 L. Ed. 2d 473 (2000); see also *State* v. *Middlebrook*, 51 Conn. App. 711, 713 n.4, 725 A.2d 351 ("statute of limitations is not a jurisdictional bar to prosecution; it is an affirmative defense, which must be raised and can be waived"), cert. denied, 248 Conn. 910, 731 A.2d 310 (1999); Practice Book §§ 41-2 and 41-4.[13] Moreover, the defendant has not provided us with any controlling authority, and we are unaware of any, indicating that it is the responsibility of *the trial court*, sua sponte, to dismiss criminal charges that are brought beyond the applicable statute of limitations. Cf. *State* v. *Crawford*, 202 Conn. 443, 451, 521 A.2d 1034 (1987) (defendant bears burden of proving statute of limitations affirmative defense); *State* v. *Woodtke*, 130 Conn. App. 734, 740, 25 A.3d 699 (2011) (same).[14] Having failed to raise his statute of limitations defense at trial,

we are compelled to conclude, in light of our case law and applicable rules of practice, that the defendant is not entitled to reversal of his conviction for burglary in the first degree under the plain error doctrine in this proceeding.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant also argues that the court committed *legal error* by "bootstrapping" hearsay evidence into an exception to the hearsay rule when it relied on the contents of the victim's statements as proof that the statements fit within the parameters of a spontaneous utterance, namely, in determining whether a startling event occurred. We decline to review this particular claim because it was not distinctly raised at trial. See, e.g., *State* v. *Rosado*, 134 Conn. App. 505, 516 n.3, 39 A.3d 1156 (declining to review defendant's claim, raised for first time on appeal, that certain evidence fell within identification exception to hearsay rule), cert. denied, 305 Conn. 905, 44 A.3d 181 (2012); see also Practice Book §§ 5-2, 5-5, and § 60-5.

[2] After providing this testimony, the court asked Morton, "what exactly did you hear her say?" In response, Morton stated: "Well, she told me to hold on because someone was at her door. I could hear her in the background saying *what are you doing here? You were supposed to actually call first.* So, that's when she got back on the phone and she told me I'll call you right back. She called me back; we talked. She didn't say anything happened or nothing like that. That is basically it." (Emphasis added.)

[3] Morton's testimony was admitted in accordance with *State* v. *Whelan*, 200 Conn. 743, 752, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). On appeal, the defendant does not challenge the admission of Morton's testimony in accordance with *Whelan*.

[4] See, e.g., *State* v. *Slater*, 285 Conn. 162, 179, 939 A.2d 1105 (declarant raped at knifepoint), cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008); *State* v. *Kirby*, supra, 280 Conn. 376 (declarant assaulted, tied up, and kidnapped); *State* v. *Wargo*, supra, 255 Conn. 126–27 (children watched house burn after father killed their mother); *Perry* v. *Haritos*, supra, 100 Conn. 483–85 (declarant driver hit pedestrian with vehicle); *State* v. *Serrano*, 123 Conn. App. 530, 537–38, 1 A.3d 1277 (2010) (declarant observed assault with blunt object), cert. denied, 300 Conn. 909, 12 A.3d 1005 (2011); *State* v. *Nelson*, 105 Conn. App. 393, 407, 937 A.2d 1249 (declarant robbed, burned, beaten, threatened with murder, tied up, and driven around), cert. denied, 286 Conn. 913, 944 A.2d 983 (2008); *State* v. *Thomas*, 98 Conn. App. 384, 387–88, 909 A.2d 57 (2006) (declarant discovered murder weapon), cert. denied, 281 Conn. 906, 916 A.2d 47 (2007); *State* v. *Westberry*, 68 Conn. App. 622, 626–32, 792 A.2d 154 (declarant heard gunshots and saw victim "hit the ground"), cert. denied, 260 Conn. 923, 797 A.2d 519 (2002).

[5] We find support for this conclusion in *State* v. *Reynolds*, 152 Conn. App. 318, 347–48, 97 A.3d 999, cert. denied, 314 Conn. 934, 102 A.3d 85 (2014), in which this court held that the victim's statements to a 911 operator regarding the unexpected appearance of a former boyfriend were spontaneous utterances. Although the defendant correctly observes that *Reynolds* involved the appearance of a former boyfriend who was acting violently, that distinguishing feature is not dispositive of the present case. "[T]he application of the exception entails a uniquely fact bound inquiry." *State* v. *Westberry*, supra, 68 Conn. App. 628. In the present case, even if the defendant did not behave in a violent manner, his sudden appearance at the victim's doorstep overwhelmed her senses based on her fear of the defendant and her expectation that he would call first. Thus, his appearance was sufficiently unnerving to be considered a "startling event."

[6] Even if we were to assume that the trial court erred in admitting the victim's statements, the defendant would not be entitled to a new trial, as he failed to demonstrate that the nonconstitutional evidentiary error substantially affected the verdict. See, e.g., *State* v. *Edwards*, 325 Conn. 97, 133, 156 A.3d 506 (2017) (noting that defendant bears burden of demonstrating nonconstitutional evidentiary error harmful). Although the victim's statements to Morton placed the defendant at the victim's home hours before her mother discovered her body, the defendant has not challenged on appeal the introduction of other evidence placing him in close proximity to her home around the time of her murder. See part II of this opinion. The victim's statements to Morton merely corroborated such unchallenged circumstantial evidence that connected the defendant to the victim's murder.

[7] The sixth amendment to the United States constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The defendant does not provide a separate argument under the Connecticut constitution.

[8] The state, relying on *State* v. *Benedict*, 313 Conn. 494, 505–508, 98 A.2d 42 (2014), also argues that we should not review the defendant's confrontation claim. Specifically, the state argues that, "by waiting until appeal to raise his confrontation claim, the defendant ambushes the state." According to the state, *Benedict* "cast[s] doubt on the vitality of [*State* v. *Smith*, 289 Conn. 598, 960 A.2d 993 (2008)]." As the state concedes, our Supreme Court has not overruled *Smith*. In accordance with that decision, unpreserved claims that the trial court violated the defendant's right to confrontation are reviewable under *State* v. *Golding*, 213 Conn. 239–40, 567 A.2d 823 (1989), when an adequate record exists. See *State* v. *Smith*, supra, 289 Conn. 620–21.

[9] According to Andrew Weaver, "[c]all data record mapping is when you actually take the call data record or the record of your phone calls and we can visualize that on a map. We can show where you were or where your handset was when you utilized your cellular carrier service to either place or receive a phone call."

[10] The defendant testified on his own behalf. On cross-examination, he testified as follows with respect to his visits to used car dealerships on May 19, 2006.

"Q. And I believe that you testified on direct examination that you—that you did not talk with any salesmen, right?

"A. No, no salesmen.

"Q. Okay. I believe your testimony was you didn't want anybody bothering you, correct?

"A. No, I was just looking.

"Q. Okay. And yes or no, did anybody come out and say 'hey, there's a beauty right there; would you like to know how many miles are on it'?

"A. No. It was damp outside.

"Q. Nobody said that?

"A. No, it was damp outside. Nobody was out there.

"Q. So nobody came out to see you, correct?

"A. Nobody was out there.

"Q. Right. Nobody at any of these car dealerships, nobody at any car—used car dealership, of the five that you went to, not one did somebody come out and say 'hey, can I help you with that'?"

[11] We are also unpersuaded by the defendant's argument that admitting Wydra's testimony was not harmless beyond a reasonable because the prosecutor repeatedly referenced it during closing argument. See, e.g., *State* v. *Thompson*, 266 Conn. 440, 456, 832 A.2d 626 (2003) (improperly admitted testimony deemed harmless, in part, because "the state's attorney did not emphasize or rely upon the testimony during closing argument"). Although the prosecutor referred to Wydra's testimony regarding the various car dealerships and used car lots that Wydra and his team visited, the prosecutor's comments, when read in context, were in reference to the prosecutor's broader argument that the cumulative effect of the evidence presented at trial revealed that the defendant's entire story was false, not simply his statements to police that he visited various car dealerships and used car lots.

[12] The record does not reflect why the state chose to pursue the burglary in the first degree charge after the statute of limitations had run. We note, however, that the state, on April 15, 2008, requested that "a reward be posted" in connection with the victim's murder because "the police [had] not been able to develop sufficient evidence to arrest anyone." On April 22, 2008, Governor M. Jodi Rell approved the state's request in accordance with General Statutes § 54-48. Thereafter, on June 19, 2008, Anthony Pugh "informed police that his cousin, [the defendant], indicated that he wanted to kill [the victim] and would use items from work including tape, smocks and booties in order to avoid detection." Notwithstanding Anthony Pugh's June 19, 2008 statement, an arrest warrant was not issued until August 24, 2012. Thus, it appears that the investigation into the victim's death remained dormant for a period of time.

[13] Practice Book § 41-2 provides that "[a]ny defense, objection or request capable of determination without a trial of the general issue may be raised only by a pretrial motion made in conformity with this chapter." "This broad provision makes clear that *any* defense, objection, or request capable of determination without trial must be raised by pre-trial motion in conformity

with this Chapter." (Emphasis in original.) D. Borden & L. Orland, 4 Connecticut Practice Series; Criminal Procedure, (4th Ed. 2007) § 41-2, p 345.

Practice Book § 41-4 provides in relevant part that "[f]ailure by a party, at or within the time provided by these rules, to raise defenses . . . that must be made prior to trial shall constitute a waiver thereof, but a judicial authority, for good cause shown, may grant relief from such waiver . . . ."

[14] We are unpersuaded by the defendant's argument and reliance on *State* v. *Marrero*, 66 Conn. App. 709, 785 A.2d 1198 (2001) and *State* v. *Kulmac*, 230 Conn. 43, 644 A.2d 887 (1994), that waiver does not apply in the present case. In *Marrero*, this court held that it was plain error for the trial court not to provide an adequate instruction on a "drug-dependent person" within the meaning of General Statutes §§ 21a-278 and 21a-278a. See *State* v. *Marrero*, supra, 720–24. Central to that decision, however, was this court's observation that, when instructing the jury, "[i]t is the *function of the court* to state the rules of law and to explain the law to be applied to the facts of the case . . . ." (Emphasis added.) Id., 723. In *Kulmac*, our Supreme Court held that it was not plain error to convict the defendant of various sexual assault and risk of injury of a child offenses when it was unclear whether General Statutes § 53a-69 barred the challenged offenses. *State* v. *Kulmac*, supra, 78. The court in *Kulmac* did not squarely address the argument raised by the state in the present case, which is that the defendant waived his statute of limitations defense by failing to raise or prove it at trial. Compare id., 76–78, with *State* v. *Coleman*, supra, 48 Conn. App. 268–69. Both *Marrero* and *Kulmac*, therefore, are legally and factually distinguishable from the present case.