******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.* WALKER
WILNER DUBUISSON
(AC 39685)

DiPentima, C. J., and Sheldon and Prescott, Js.

*Syllabus*

Convicted of the crime of strangulation in the second degree in connection
with a dispute with the victim, the defendant appealed to this court,
claiming, inter alia, that the evidence was insufficient to support his
conviction. Following a dispute with the victim, the defendant pushed
her against a wall, put his fingers into her trachea and his entire hand
around her neck, and began strangling her. The victim was unable to
breathe for thirty seconds to one minute, her body became limp and
she urinated herself. About one hour after the incident, while the defen-
dant was outside of the home, the victim telephoned her friend, P. The
victim told P that she was hurt and that the defendant had strangled
her. P testified that the victim sounded fearful and very anxious, and
that her voice was raspy. On appeal, the defendant claimed that the
evidence was insufficient to prove that he had the intent to impede the
victim's ability to breathe or to restrict her blood circulation, or that,
while acting with that intent, he actually impeded her ability to breathe
or restricted her circulation. *Held*:

1. The evidence was sufficient for the jury to have found beyond a reasonable
doubt that the defendant committed strangulation in the second degree,
as the jury reasonably and logically could have concluded that the
defendant put his hand around the victim's neck with the intent to render
her unable to breathe and, while acting under that intent, squeezed her
neck with his fingers and rendered her unable to breathe; the victim
testified that, as a result of the defendant's conduct, she was unable to
breathe for between thirty and sixty seconds, she saw black, her body
became totally lifeless and she urinated herself, P testified that the
victim's voice sounded raspy during their telephone call, that when P
arrived at the victim's home, the victim told her that she was having a
difficult time swallowing and that her throat hurt too badly for her to
drink water, and both P and a state police trooper who responded to
the victim's home saw red marks that appeared to be consistent with
fingerprints on the victim's neck.

2. The trial court did not abuse its discretion by admitting into evidence,
under the spontaneous utterance exception to the hearsay rule, P's
testimony regarding the victim's statements to her during their telephone
conversation; P testified that the victim sounded fearful, anxious and
in pain, and although the victim had called another individual before
she called P and there was a break in time between when the defendant
strangled the victim and when the victim called P, the court reasonably
could have determined that the victim was still under the stress of the
situation and was experiencing such shock from being strangled by the
defendant and such fear due to his continued presence outside her
home, as to deprive her of the opportunity to collect her thoughts
or to reflect on the incident with the defendant before she made the
statements to P.

Argued March 12—officially released June 26, 2018

*Procedural History*

Substitute information charging the defendant with
the crime of strangulation in the second degree, brought
to the Superior Court in the judicial district of Windham,
geographical area number eleven, and tried to the jury
before *Seeley, J.*; verdict and judgment of guilty, from
which the defendant appealed to this court. *Affirmed*.

*Peter Tsimbidaros*, assigned counsel, for the appel-
lant (defendant).

*Linda F. Currie-Zeffiro*, assistant state's attorney, with whom were *Anne F. Mahoney*, state's attorney, and *Mark A. Stabile*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Walker Wilner Dubuisson, appeals from the judgment of conviction rendered by the trial court, following a jury trial, on the charge of strangulation in the second degree in violation of General Statutes § 53a-64bb. The defendant claims that (1) the evidence was insufficient to support his conviction and (2) the trial court erred in admitting certain out-of-court statements by the victim[1] under the spontaneous utterance exception to the hearsay rule. We affirm the judgment of the trial court.

The jury was presented with the following evidence on which to base its verdict. The victim testified that she met the defendant while he was an employee at a Walmart store in Massachusetts and she was participating in a manager training program at that store. Thereafter, they engaged in a six to eight month intimate relationship, during which he moved into her home in Connecticut. On the evening of February 22, 2015, the victim returned home after work to find that it had snowed in her absence, but the driveway was shoveled inadequately. She thus brought her things inside the house, then returned outside to finish shoveling the driveway. The defendant, who was home when the victim arrived, opened the door and began "yelling at" her for shoveling, insisting that he had shoveled already. When she ignored him and continued to shovel, the defendant opened the door once again and threw[2] the couple's dog outside. The victim ran into the street to retrieve the dog, which she brought inside to its crate in the bedroom.

Finding the defendant in the bedroom when she brought the dog inside, the victim began to yell at him for throwing the dog. According to the victim's testimony, he responded by approaching her, "push[ing] [her] left shoulder against the wall," "turn[ing her] around and . . . lock[ing] his fingers into [her] trachea, then . . . tak[ing] his whole hand around [her] neck and strangl[ing] [her]." The victim further testified that, while the defendant was holding her in this manner, she "couldn't breathe," she remembered "everything going black" and her body "go[ing] totally limp," and she "urinated [her]self . . . ." After he released her, she "told him to get his belongings and that the cops were coming and [to] leave [her] home." Although the defendant gathered up his belongings and carried them outside to his car, he did not drive away, but instead began to walk back and forth in the driveway. Because the victim, observing this behavior, felt "fearful that he was going to try to break a window or break [her] door," she called her son's friend, Dean Mayo, in an unsuccessful effort to contact her son, then called her own friend, Michelle Perez. Both Mayo and Perez responded to these calls by driving immediately to the victim's house.

Mayo arrived first. He testified at trial that he had decided to come over upon realizing that something was wrong because the victim sounded "frantic" and told him that she had gotten into a fight with the defendant. When he arrived, he saw the victim inside the house and the defendant outside in the driveway. The victim, he recalled, was "very emotional," crying and shaking, and her face and neck were "very red." Mayo was not asked by the police to give them a statement.

Perez testified that the victim sounded "fearful, very anxious" on the phone, and that her voice was "raspy . . . ." During the call, the victim described to Perez the events of the evening, starting from the time she had arrived home from work. Among other things, the victim told Perez that "she was hurt, [and] that [the defendant] had strangled her." When the victim told Perez that the defendant was still outside her home, Perez, who lived a twenty minute drive away from the victim, drove directly to the victim's house at the conclusion of the call. When she arrived, she noticed the defendant, whom she described at trial as "very tense and agitated," standing in the driveway outside of his car, which had a flat tire. When Perez asked the defendant what had happened, he responded first by "rambling" about the dog and the snow shoveling, then by calling the victim various "derogatory names." When she asked him whether he had put his hands on the victim and hurt her, he responded that he "put [his] hands on her. She's a crazy 'b' and she upset [him]." Perez told the defendant to leave because she would be calling the police, then went inside to check on the victim.

Perez described the victim's face and neck as red and stated that the victim had "clearly visible" finger marks around her neck. The victim told Perez that she was having a very hard time swallowing. After they discussed "the extent or the severity of [the victim's] possible injuries," Perez called the police. At 8:43 p.m., Connecticut State Police Trooper Trisha Marcaccio was dispatched to the victim's house. Trooper Joseph Marsh also was dispatched, separately. Marcaccio spoke to the defendant, who admitted that he had been in an argument with the victim and that he had pushed her, but denied that he had strangled her. Marcaccio then left Marsh outside with the defendant[3] while she went inside to speak with the victim and Perez. Marcaccio observed that the victim had "fresh red marks" on her neck, "consistent with fingerprints from a hand." The victim told Marcaccio that the defendant had strangled her, rendering her unable to breathe for thirty to sixty seconds.[4] Marcaccio photographed the injuries and took statements from the victim and Perez. After Marcaccio finished taking statements and photographs, she went outside and instructed Marsh to arrest the defendant[5] and to transport him to the state police barracks

for processing. Marcaccio also called an ambulance, but the victim refused transport. Perez later drove the victim to the Backus Plainfield Emergency Care Center, where she was admitted at 10:32 p.m.

In the emergency department, the victim received a visual physical examination, computerized axial tomography (CT) scans, and X-rays. Her X-rays were entirely normal, and her CT scans revealed normal glands and lungs, no bruising, no fluid collection or swelling, and no compromise of her airway. She reported tenderness and was prescribed an anti-inflammatory. In a follow-up appointment on February 24, 2015, with her primary care physician, Dr. Walter McPhee, the victim was diagnosed with inflammation of the trachea and anxiety, and prescribed an anti-inflammatory and a tranquilizer. She did not have bruising on her neck at the time, but McPhee did not find that unusual because she had indicated that she had been strangled two days prior to the examination.

In a substitute information, the defendant was charged with strangulation in the second degree. The jury found the defendant guilty. Following the verdict, on May 2, 2016, the defendant filed a motion for a judgment of acquittal, or, in the alternative, for a new trial in the interest of justice. The court denied that motion in its entirety. The defendant later was sentenced on his conviction of strangulation in the second degree to five years incarceration, execution suspended after fifteen months, followed by three years of probation with special conditions. The defendant then filed this appeal. Additional facts will be set forth as necessary.

I

We begin with the defendant's first claim, which challenges the sufficiency of the evidence to support his conviction.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether

the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Morel*, 172 Conn. App. 202, 214, 158 A.3d 848, cert. denied, 326 Conn. 911, 165 A.3d 1252 (2017).

"As we have often noted, however, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]t is immaterial to the probative force of the evidence that it consists, in whole or in part, of circumstantial rather than direct evidence." (Internal quotation marks omitted.) *State* v. *Edwards*, 325 Conn. 97, 136–37, 156 A.3d 506 (2017).

Section 53a-64bb (a) provides: "A person is guilty of strangulation in the second degree when such person restrains another person by the neck or throat with the intent to impede the ability of such other person to breathe or restrict blood circulation of such other person and such person impedes the ability of such other person to breathe or restricts blood circulation of such other person." Accordingly, "[t]o establish strangulation in the second degree, the state must show that the defendant restrained the victim by the neck or throat with the intent to impede her ability to breathe, and such impediment must have occurred." *State* v. *Linder*, 172 Conn. App. 231, 239, 159 A.3d 697, cert. denied, 326 Conn. 902, 162 A.3d 724 (2017). The defendant argues that the evidence was insufficient to prove either that he had the intent to impede the victim's ability to breathe or to restrict her blood circulation, or that, while acting with that intent, he actually impeded her ability to breathe or restricted her circulation. We disagree.

The jury heard evidence that the defendant locked his fingers into the victim's trachea, and put his entire hand around her neck and strangled her. The victim also testified that, as a result of the defendant's conduct, she saw black, her body became totally lifeless and she urinated herself. The victim stated that once the defendant began to strangle her, she was unable to breathe for between thirty and sixty seconds. As a result, when the victim called Perez one hour later, her voice sounded raspy. Later still, when Perez arrived at the victim's house, the victim told her that she was having a very difficult time swallowing and that her throat hurt too badly for her even to drink water. Both Perez and Marcaccio saw red marks that appeared to

be consistent with fingerprints on the victim's neck. At the hospital, medical staff did not find crepitus,[6] swelling, or difficulty breathing; the victim's voice was fine and her chest and neck X-rays were entirely normal; and CT scans of her neck and chest revealed no bruising, normal glands and lungs, no fluid collection or swelling, and no compromise of her airway. Even so, the victim's primary care physician testified that negative findings on the examinations performed at the emergency department are not unusual a couple of hours after strangulation, depending on its severity.

Notwithstanding this evidence, the defendant claims that "[m]edical and physical factors which have been commonly used to sustain a conviction of strangulation were not present" in this case. The defendant further argues that he was "convicted on what amounts to a modicum of evidence—essentially the [victim's] testimony and hearsay statements to Perez." He claims that the victim was not credible because there were discrepancies between her testimony at trial and the statement that she made to the police on the night of the incident, and she had both a demonstrable bias against him and "a motive to fabricate the incident."[7] The state counters that argument by suggesting that the defendant "confuses sufficiency with credibility." We agree with the state. "The arguments raised by the defendant on appeal with regard to [the victim's] credibility are arguments that the defendant properly raised at trial. They were for the [jury's] consideration in determining what weight to afford the [victim's] credibility. . . . The [jury] found the victim's testimony credible . . . . Because questions of whether to believe or to disbelieve a competent witness are beyond our review, we reject the defendant's argument." (Internal quotation marks omitted.) *State* v. *Liborio A.*, 93 Conn. App. 279, 285, 889 A.2d 821 (2006).

On the basis of the evidence presented, construed in the light most favorable to sustaining the verdict, the jury reasonably and logically could have concluded that the defendant put his hand around the victim's neck, with the intent to render her unable to breathe, and, while acting under that intent, squeezed her neck with his fingers, thereby rendering her unable to breathe. On that basis, we conclude that sufficient evidence existed from which the jury could have found that the defendant committed strangulation in the second degree beyond a reasonable doubt.

II

We next turn to the defendant's second claim challenging the trial court's admission of the victim's out-of-court statements under the spontaneous utterance exception to the rule against hearsay. Specifically, the defendant challenges the testimony of Perez, who testified over objection that the victim stated, during the victim's telephone call to her on the evening of February

22, 2015, that "she was hurt, that [the defendant] had strangled her." The defendant argues that those statements, allegedly made approximately one hour after the incident, were not made under circumstances that negated the opportunity for deliberation and fabrication by the declarant.[8] We disagree.

The following additional facts and procedural history are relevant to the resolution of the defendant's claim. On the evening of February 22, 2015, as noted previously, the victim placed a call to Perez, her friend of twenty-six years. At trial, the state called Perez to testify regarding the statements the victim had made to her during that call. In the presence of the jury, the following colloquy occurred:

"[The Prosecutor]: Drawing your attention to February 22 of 2015, did you or did you not get a telephone call from [the victim] on that day?

"[Perez]: Yes, I did.

"[The Prosecutor]: Without getting into the content of the phone call, how would you describe her during the conversation?

"[Perez]: Her voice sounded and the content of what she was describing to me, she sounded fearful, very anxious, her voice was raspy and as if—you can tell when a person's been through something or crying for a bit, and she sounded like she was in pain, but she sounded scared most of all.

"[The Prosecutor]: Upset?

"[Perez]: Very upset.

"[The Prosecutor]: Distraught?

"[Perez]: Very distraught.

"[The Prosecutor]: Did she describe to you something that had just recently happened?

"[Perez]: Yes, she did.

"[The Prosecutor]: Did she indicate when it had happened?

"[Perez]: Yes, she did.

"[The Prosecutor]: And when had it happened?

"[Perez]: It happened earlier—February 22, that same day that I received the phone call, earlier that afternoon when she arrived home from work, after she arrived from work.

"[The Prosecutor]: What did she say had happened to her?

"[Perez]: She—

"[Defense Counsel]: Your Honor, we would object to that pending—

"The Court: All right.

"[Defense Counsel]: —the—the answer.

"The Court: On grounds?

"[Defense Counsel]: Hearsay.

"[The Prosecutor]: It's a spontaneous utterance, Your Honor. I think from both this witness and the first witness, we've established the basis for that.

"The Court: All right. Overruled. . . .

"[Perez]: She stated to me—she started retelling of the incident earlier that—late afternoon after she had arrived home from work at approximately, I would put it at about 6, 6:30ish, that she had arrived home and she had to shovel the driveway because no one had done it, so she couldn't pull in. And then she was also retelling the story of the dog being thrown outside and running out into the street almost getting hit by a car. She stated that—even before all of that, she stated to me that she was hurt, that [the defendant] had strangled her. And she went on to explaining the details of what was occurring, what had occurred."

"Before we address the defendant's claim, we set forth the applicable legal principles. An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies. . . . Among the recognized exceptions to the hearsay rule is the spontaneous utterance exception, which applies to an utterance or declaration that: (1) follows some startling occurrence; (2) refers to the occurrence; (3) is made by one having the opportunity to observe the occurrence; and (4) is made in such close connection to the occurrence and under such circumstances as to negate the opportunity for deliberation and fabrication by the declarant. . . . [T]he ultimate question is whether the utterance was spontaneous and unreflective and made under such circumstances as to indicate the absence of opportunity for contrivance and misrepresentation. . . . Whether an utterance is spontaneous and made under circumstances that would preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge. . . . The trial judge exercises broad discretion in deciding this preliminary question, and that decision will not be reversed on appeal absent an unreasonable exercise of discretion. . . .

"To be admissible as a spontaneous utterance, [t]he event or condition must be sufficiently startling so as to produce nervous excitement in the declarant and render [the declarant's] utterances spontaneous and unreflective. . . . In reviewing the defendant's claim, we bear in mind that whether a statement is truly spontaneous as to fall within the spontaneous utterance exception [is] . . . reviewed with the utmost deference to the trial court's determination." (Citations omit-

ted; internal quotation marks omitted.) *State* v. *Pugh*, 176 Conn. App. 518, 523–24, 170 A.3d 710, cert. denied, 327 Conn. 985, 175 A.3d 43 (2017).

The defendant argues that the victim's challenged statements to Perez were not made under circumstances that negated the opportunity for deliberation and fabrication because the victim "purportedly made the statement[s] . . . as much as an hour after the incident," during which time she could have reflected on the event. In making his argument, the defendant refers us to a number of cases in which statements admitted as spontaneous utterances were made within one-half hour of the occurrences to which they referred[9] and urges us to draw the conclusion that one hour in this case was too long a period for the utterances to be spontaneous. The defendant's reliance on those cases for that purpose is misplaced.

"In determining whether a declaration is admissible as a spontaneous utterance, the court should look at various factors, including [t]he element of time, the circumstances and manner of the [occurrence], the mental and physical condition of the declarant, the shock produced, the nature of the utterance, whether against the interest of the declarant or not, or made in response to question, or involuntary, and any other material facts in the surrounding circumstances . . . ." (Internal quotation marks omitted.) *State* v. *Daley*, 161 Conn. App. 861, 884, 129 A.3d 190 (2015), cert. denied, 320 Conn. 919, 132 A.3d 1093 (2016). "The relation of the utterance in point of time to the . . . occurrence, while an important element to be considered in determining whether there has been opportunity for reflection, is not decisive. . . . Instead, [t]he overarching consideration is whether the declarant made the statement before he or she had the opportunity to undertake a reasoned reflection of the event described therein." (Citation omitted; internal quotation marks omitted.) Id. "[W]e follow the rule embraced by the majority of jurisdictions that have addressed the issue of the effect of the time interval between the startling occurrence and the making of the spontaneous utterance, and conclude that there is no identifiable discrete time interval within which an utterance becomes spontaneous; [e]ach case must be decided on its particular circumstances." (Internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 375, 908 A.2d 506 (2006).

Here, although there was a break in time between when the defendant strangled the victim and when the victim placed a call to Perez, she made the call after she had ordered the defendant to leave but he was still standing in her driveway, "going back and forth . . . ." Perez testified that during the call the victim sounded fearful, anxious and in pain. The trial court did not abuse its discretion in concluding that the victim was still under the stress of the situation to which her state-

ments related when she placed the call and made the statements, and thus that the statements were admissible as spontaneous utterances.

The defendant also argues that the statements should not have been admitted as spontaneous utterances because the victim spoke to Mayo on the phone before calling Perez. He cites to *State* v. *Gregory C.*, 94 Conn. App. 759, 771–72, 893 A.2d 912 (2006), for the proposition that a statement is not admissible as a spontaneous utterance when the declarant spoke at length with a third party before making the statement. In *Gregory C.*, the defendant claimed that the trial court erred in admitting, as spontaneous utterances, certain statements the victim made to a police officer the day after she claimed to have been sexually assaulted. Id., 769. The defendant argued that both the length of the delay between the alleged assault and the making of the challenged statements, and the fact that the victim had discussed the alleged assault with a close friend in the interim, made the statements inadmissible under the spontaneous utterance exception to the hearsay rule. Id., 771. This court agreed with the defendant, holding that the trial court erred in admitting the statements as spontaneous utterances because "more than fifteen hours had passed between the time of the alleged sexual assault and the victim's statement to [the police] . . . [and] the victim discussed her alleged assault at length with [her friend] prior to giving her statement." Id., 771–72. The exception did not apply to the victim's statements because the victim had "had considerable time and opportunity to collect her thoughts and reflect on what had occurred the night before." Id., 772. *Gregory C.* is readily distinguishable from this case. Here, although the victim called Mayo before she called Perez, she did so within one hour of her alleged strangulation while the defendant was still outside her home. Under those circumstances, the court reasonably could have determined that, during her conversation with Perez, the victim was still experiencing such shock from being strangled by the defendant and such fear due to his continuing presence outside her home, as to deprive her of the opportunity to collect her thoughts or reflect on the incident before making the challenged statements.

Accordingly, we conclude that the trial court's admission, under the spontaneous utterance exception to the hearsay rule, of Perez' testimony regarding the victim's out-of-court statements to her about her strangulation by the defendant was not "an unreasonable exercise of discretion." (Internal quotation marks omitted.) *State* v. *Pugh*, supra, 176 Conn. App. 524.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of a person protected under a standing criminal protective order, we decline to

identify the protected person or others through whom the protected person's identity may be ascertained.

[2] At trial, the victim testified that the defendant had thrown the dog. In the report she gave to the police that night, the victim said the defendant let the dog out, but did not indicate that he had thrown the dog.

[3] Trooper Kenneth Poplawski also responded and stood in the driveway with Marsh and the defendant.

[4] The victim did not tell Marcaccio that she had blacked out or urinated herself during the incident.

[5] The defendant originally was charged with disorderly conduct in violation of General Statutes § 53a-182 (a), assault in the third degree in violation of General Statutes § 53a-61 and strangulation in the second degree in violation of § 53a-64bb.

[6] Dr. McPhee testified that crepitus is a "rupture or . . . an air leak under the tissues" and that it is tested for by putting pressure on the area to move air bubbles around, which makes a distinctive noise.

[7] Specifically, the defendant argues that the victim's motive was demonstrated by text messages introduced at trial that the victim sent to the defendant. The victim testified that the defendant went to Massachusetts on February 18, 2015, and did not return to her house at the time he had indicated to her that he would. The defendant argues on appeal that the series of text messages shown to the victim on cross-examination, including: "You took all you needed in your sleepover bag, didn't tell me either, so that is [four] lies!!!" "You got [your] sleepover bag, your taxes, your bitch, have a great life," and, "You have done me wrong for the very last time. I promise you that. . . . [Y]ou are not able to come by or have any contact with me or anything that pertains to me, surrounds me. I have the state police restraining order on you," were all sent on February 18, 2015, and indicate that "the [victim] forged a plan to have the defendant arrested four days prior to the incident . . . ."

[8] The defendant also argues that the admittance of the statements was harmful error of a constitutional magnitude. Because we find no error, we decline to address the defendant's claim.

[9] See *State* v. *Kirby*, 280 Conn. 361, 377, 908 A.2d 506 (2006) ("[m]oreover, all of the statements at issue were made within one-half hour of the complainant having arrived home from her multihour altercation with the defendant, which our cases indicate is not an excessive time lapse for purposes of avoiding contrivance or fabrication by an alleged victim"); *State* v. *Stange*, 212 Conn. 612, 620, 563 A.2d 681 (1989) ("In the present case, the record indicates that the victim's statements were made approximately fifteen to thirty minutes after a shooting that inflicted serious wounds. . . . There is nothing in the record to suggest that the victim, at the time he made the statements, was no longer under the influence of the stress and excitement of being shot."); and *State* v. *Arluk*, 75 Conn. App. 181, 190, 815 A.2d 694 (2003) ("it was not an abuse of discretion for the court to admit the . . . statement, which was made twenty to thirty minutes after the events that had occurred").

_____