******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* TONY O.*
(AC 43250)

Moll, Suarez and Sheldon, Js.

*Syllabus*

Convicted, after a jury trial, of various crimes in connection with an altercation with his wife, W, the defendant appealed to this court. The defendant had gone to the gas station where W was employed to obtain from her the keys to his truck so that he could get tools he needed for work that were stored in the truck. When he walked around the front counter toward W and reached toward her handbag that was on a counter behind her, she pushed him away, and a physical encounter ensued between them during which she sustained injuries and thereafter was treated at a hospital. S, a customer at the store, witnessed part of the altercation and attempted to break it up. W told a police officer, who arrived minutes after the defendant left the gas station, that the defendant had attacked her. At trial, the police officer testified to that statement, and the defendant objected. The trial court overruled the objection and admitted the statement into evidence as a spontaneous utterance under the applicable provision (§ 8-3 (2)) of the Connecticut Code of Evidence. On appeal, the defendant claimed, inter alia, that the evidence was insufficient to support his conviction of the charges of robbery and unlawful restraint, and that the trial court improperly admitted W's statement to the police officer. *Held*:

1. Although the evidence was sufficient to support the defendant's conviction of unlawful restraint in the first degree, there was insufficient evidence to support the jury's necessary finding that he seized W's handbag in the course of committing a larceny, as required to convict him of robbery in the third degree:

   a. The jury had no reasonable basis for finding that the defendant's brief taking of the handbag was accompanied by a felonious intent to steal and deprive W of it permanently: although the jury was entitled to reject the defendant's testimony that his only purpose in seizing the handbag was to search it for the keys to the truck, the jury was not entitled to draw the contrary inference that his intent was to steal the handbag, as the record provided no nonspeculative basis for that inference; moreover, the jury could not infer the defendant's intent because W began to struggle with him as soon as he reached for the handbag, as her strong resistance delayed his seizure of the handbag, which he held on to for only eight seconds before dropping it to the floor, and, although whatever the defendant intended when he first picked up the handbag appeared to change once S struck him in the back and told him that the police were on their way to the station, that inference shed no light on the intent with which he initially took possession of the handbag, as his interest in leaving the scene before the police arrived did not support an inference that he initially took the handbag with the intent to steal it from W; furthermore, the only positive evidence from which the jury might have drawn an inference as to the defendant's intent when he seized the handbag was the video footage of the incident from the station's surveillance cameras, which showed that his actions during the incident were consistent with his testimony that his only purpose in coming to the gas station was to get his truck keys from W.

   b. There was more than enough evidence to support the jury's findings beyond a reasonable doubt that the defendant restrained W during their physical altercation and exposed her to a substantial risk of physical injury: W stated to the police officer that the defendant had attacked or assaulted her, she told the staff at the hospital that he had punched her and caused her to fall into a chair, where he kneed her and kicked her in the head, and the video footage from the station's surveillance cameras corroborated S's testimony that, after W was seated in the chair, he continued to lean over her and strike her, which caused her to remain in the chair when she attempted to get up, and it would have been reasonable for the jury to conclude that the defendant engaged in such conduct with the specific intent to interfere substantially with W's liberty;

moreover, notwithstanding the defendant's suggestion that W restrained him as much as he restrained her, the jury reasonably could have concluded that she was restricted in her movements in a manner that interfered with her liberty, and the defendant's admission that he assaulted her during the incident overrode his suggestion that any restraint he might have applied was not applied so as to expose her to a substantial risk of physical injury, as the state presented evidence that included the hospital record documenting her injuries, the video footage showing the defendant's physical struggle, and S's account of the several times he kneed W while she was forced to remain sitting in the chair.

2. The defendant could not prevail on his claim that the trial court improperly admitted the police officer's testimony about the initial oral statement made to him by W:

a. The record clearly supported the trial court's finding that the statement by W to the police officer was admissible as a spontaneous utterance: W was in distress and very emotional when she first spoke with the officer, as she appeared to be crying, her breathing was heavy, and she had red marks on her neck and face, she made her initial statement to the officer roughly three minutes after the defendant released her from his grasp and drove away, and the fact that she gave a fuller, more detailed statement at the hospital showed that her initial statement to the officer was spontaneous, unreflective and made under such circumstances as to indicate the absence of an opportunity for contrivance and misrepresentation; moreover, on the basis of the defendant's unqualified admission of the assault and the overwhelming evidence that confirmed that admission, any error by the trial court in admitting W's statement as a spontaneous utterance was clearly harmless, the defendant having failed to demonstrate that its admission substantially affected the verdict.

b. The defendant's unpreserved claim that his right to confrontation was violated because he never was afforded the opportunity to cross-examine W about her statement to the police officer was unavailing: evidence of the video footage of the altercation, the hospital records that documented W's physical injuries, S's description of the assault and identification of the defendant as the perpetrator, and the defendant's admission of the assault overwhelmingly supported the state's claim that he assaulted W during their physical altercation; moreover, W's statement was cumulative of and corroborated by that evidence, and it was not an integral portion of the state's case, as it was never mentioned during the state's closing argument to the jury.

Argued September 8, 2021—officially released March 29, 2022

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crimes of attempt to commit larceny in the second degree, robbery in the third degree, unlawful restraint in the first degree, assault in the third degree and attempt to commit larceny in the sixth degree, and, in the second part, with being a persistent serious felony offender and a persistent offender, brought to the Superior Court in the judicial district of Windham, geographical area number eleven, and tried to the jury before *Chaplin, J.*; verdict and judgment of guilty of robbery in the third degree, unlawful restraint in the first degree and assault in the third degree, and sentence enhanced for being a persistent serious felony offender and a persistent offender, from which the defendant appealed to this court. *Reversed in part*; *judgment directed*.

*James B. Streeto*, senior assistant public defender, with whom, on the brief, was *Jane L. Stream*, certified legal intern, for the appellant (defendant).

*Jonathan M. Sousa*, deputy assistant state's attorney, with whom, on the brief, were *Maureen T. Platt*, state's

attorney, and *Mark Stabile*, former supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Tony O., appeals from the judgment of conviction, rendered against him after a bifurcated jury trial on charges arising from a physical altercation between himself and his wife (complainant) at her place of work in Willimantic, on April 6, 2017. In the first part of the trial, the jury found the defendant guilty on three counts of a long form information charging him, respectively, with robbery in the third degree in violation of General Statutes § 53a-136, unlawful restraint in the first degree in violation of General Statutes § 53a-95, and assault in the third degree in violation of General Statutes § 53a-61. The jury found the defendant not guilty, however, on two other counts of the information charging him, respectively, with attempt to commit larceny in the second degree in violation of General Statutes §§ 53a-49 and 53a-123 (a) (2), and attempt to commit larceny in the sixth degree in violation of General Statutes §§ 53a-49 and 53a-125b. In the second part of the trial, the same jury found the defendant guilty on both counts of a part B information charging him, respectively, with being a serious persistent felony offender in violation of General Statutes § 53a-40 (c), as a basis for enhancing his impending sentence on the charge of unlawful restraint in the first degree, and being a persistent offender of crimes involving assault, stalking, threatening, harassment, and criminal violation of a protective order in violation of General Statutes § 53a-40d, as a basis for enhancing his impending sentence on the charge of assault in the third degree. The trial court, *Chaplin*, *J.*, ultimately sentenced the defendant to a total effective term of six years of imprisonment followed by four years of special parole.[1] This appeal followed.

On appeal, the defendant claims that the trial court erred in (1) failing to enter a judgment of acquittal on the charge of robbery in the third degree because, inter alia, there was insufficient evidence to support the jury's necessary finding beyond a reasonable doubt that he seized the complainant's handbag in the course of their altercation with the intent to deprive her of it permanently, as the state sought to prove in order to establish that he committed robbery by using physical force on her in the course of committing a larceny with respect to the handbag, (2) failing to enter a judgment of acquittal on the charge of unlawful restraint in the first degree because there was insufficient evidence to support the jury's necessary findings beyond a reasonable doubt that he restrained the complainant in the course of the altercation and did so under circumstances that exposed her to a substantial risk of physical injury, (3) admitting as a spontaneous utterance, over his timely hearsay objection, evidence of the nontestifying complainant's initial oral statement to the police accusing him of attacking her, and (4) admitting that

same initial oral statement by the complainant to the police through the testimony of the police officer to whom she made the statement, without affording him the opportunity to cross-examine the complainant, in violation of his sixth and fourteenth amendment rights to confront the witnesses against him. We agree with the defendant that the evidence was insufficient to support his conviction of robbery in the third degree, and thus we reverse the judgment of conviction on that charge and remand this case to the trial court with direction to enter a judgment of acquittal thereon. We disagree with the defendant, however, as to his other claims of error, and thus affirm the judgment in all other respects.

The jury was presented with the following evidence on which to base its verdict in the first part of the defendant's trial. On the afternoon of April 6, 2017, Officer Nicholas Sullivan of the Willimantic Police Department was dispatched to the Valero gas station on West Main Street in Willimantic to investigate the report of an armed robbery at that location. Sullivan testified that, upon arriving at the gas station at or about 3:36 p.m., he saw no evidence of an ongoing robbery but found three women waiting for him in the convenience store section of the station. One of the women, the complainant, an employee of the gas station, initially told Sullivan, who testified about her statement over the defendant's hearsay objection, that while she was working at the station that afternoon, "her husband, [the defendant], came into the store and attacked her."[2] Sullivan testified that, when the complainant made that initial statement to him, she was emotional and appeared to be in distress. He recalled, more particularly, that, when they first spoke, she appeared to be crying, her breathing was heavy, her hair was a mess, and she had red marks on her neck and face. The second woman was identified only as the complainant's daughter, whom other evidence would show was in the store when a physical altercation began between her mother and the defendant and remained in the store for a short time thereafter before walking outside to call the police.[3] The third woman was identified as Chrimson Strede, a regular customer of the store, who told Sullivan and later testified that she had witnessed part of the altercation between the complainant and the defendant and ultimately attempted to break it up. Strede was the only person with whom Sullivan spoke at the gas station on the day of the incident who later testified at trial.

Sullivan testified that, in light of the complainant's injuries, she was initially transported to Windham Hospital, where he photographed the injuries, and she received treatment by hospital staff. The state further documented the complainant's injuries by introducing the hospital records of her treatment on the afternoon of the incident, in which the hospital staff described the injuries, much as Sullivan had observed them, as a

small bruise and swelling to the left side of her eye and a subtle abrasion on the left side of her neck. The hospital records identified the cause of the injuries, as the complainant had reported it to hospital staff, as an "assault" on her by the defendant, who allegedly "came to her job and got physical [with her]." The complainant told the hospital staff, more specifically, that the defendant had "punched [her] in the face," causing her to "[fall] back into a chair," and then "kick[ed] and knee[d] [her] in the head."

Sullivan next testified about the video surveillance system at the gas station, which continuously recorded video footage of activity at the station from multiple angles both inside and outside of the convenience store. Upon returning to the gas station to conduct further investigation after the complainant had been treated at the hospital, Sullivan reviewed video footage of the incident, as recorded by the video surveillance system, and copied it onto a zip drive, from which he later made a second copy on a hard disk that he attached to his report. The video footage so recorded, which had no audio component but was marked on each frame with the time and date on which it was recorded, was initially played for the jury in its entirety, without interruptions by counsel or commentary by Sullivan.

The video footage, which the prosecutor would later describe in closing argument to the jury as "98 percent of this case," depicted the following sequence of events. At 3:31:24 p.m. on April 6, 2017, a man identified as the defendant walked through the front door of the store, carrying nothing. At 3:31:33 p.m., the defendant approached the front counter of the store, which had a cash register on it, behind which two women, identified as the complainant and her daughter, were working. The defendant reached over to a rear counter behind the complainant's daughter and picked up a pink wallet that was lying there. At 3:31:36 p.m., the defendant turned away from the counter while opening the wallet and looked inside it. Shortly thereafter, however, at 3:31:39 p.m., the defendant quickly closed the wallet, turned back toward the counter, and set the wallet back down where he had picked it up without removing anything from it. He then walked around the front counter toward the complainant and reached behind her toward a brown and white handbag lying farther down the rear counter behind her. When he did so, at 3:31:42 p.m., the complainant stood up and forcefully pushed him away, initiating a physical altercation between them that would last for just over one minute before coming to an end.

Thirteen seconds into the altercation, at 3:31:55 p.m., the defendant finally seized the handbag for which he had been reaching behind the complainant with his right hand. Eight seconds later, however, at 3:32:03 p.m., he dropped the handbag to the floor as he and the

complainant, still struggling with each other, moved out from behind the front counter. At that point, the complainant's daughter picked up a cell phone from the rear counter and walked out of the store. Nine seconds later, at 3:32:12 p.m., the complainant placed the defendant in a headlock, from which he broke free by forcing her to sit down in a nearby chair. After the complainant was seated in the chair, the struggle continued, with the defendant leaning over the complainant while she held him with her arms and attempted to restrain him with her legs.

The video footage also depicts that, a third woman, later identified as Strede, drove into the gas station and got out of her vehicle, spoke briefly with the complainant's daughter, and then entered the store at 3:32:18 p.m. After the complainant, still seated, and the defendant, still leaning over her, exchanged multiple physical blows in Strede's presence, Strede approached them. As she did so, at 3:32:33 p.m., the complainant pointed down toward the handbag on the floor, and Strede picked it up and tossed it onto the front counter by the cash register. Immediately thereafter, Strede briefly exited the store and spoke again to the complainant's daughter, who was still standing outside the front door, while the defendant, who was still struggling with the complainant, continued to strike her with his right knee. Strede then reentered the store at 3:32:41 p.m., walked directly to the defendant and shoved him as he was kneeing the complainant at 3:32:45 p.m., then struck him in the back at 3:32:47 p.m. At that point, the defendant released his grasp of the complainant, stood up, and walked out of the store without reaching again for the handbag or taking anything else from the complainant or the store.

On cross-examination, Sullivan testified that, although he had been dispatched to the gas station on the report of an armed robbery, he never found any weapons at the gas station and was never told by anyone that the defendant had wielded a weapon in the course of the incident. He further testified that, to the best of his knowledge, the defendant never took anything from the complainant or the store in the course of the incident.

After Sullivan testified, the state called three more witnesses in the first part of the trial. Lieutenant Paul M. Hussey of the Willimantic Police Department testified that, as he and Officer James Salvatore were returning from a firearms range on the day of the incident, they heard a bulletin advising them to be on the lookout for the defendant. Because Hussey was familiar with the defendant and knew where he lived, he and Salvatore drove directly to the defendant's residence. Shortly after their arrival, a fellow officer, Corporal Matthew Nixon, arrived there as well. When the officers rang the defendant's doorbell, the defendant answered

the door personally and correctly identified himself by name. The officers then asked the defendant if he had been at the gas station earlier that afternoon, and he admitted that he had. According to Nixon, who also later testified about his role in taking the defendant into custody, the defendant was cooperative and fully compliant with the officers throughout their interaction with him that afternoon.

Finally, the jury heard testimony from Strede, who confirmed that she had witnessed the latter portion of the incident at the gas station, as shown on the video recording. Strede further testified that she was familiar with the complainant, who worked as a cashier in the convenience store at the station, because she went there almost every day to buy provisions for work before the start of her evening shift at a local restaurant. Strede recalled that, on the day of the incident, when she pulled up to the gas station, she saw the complainant's daughter outside, "kinda panicking . . . ." Upon entering the store, Strede saw the complainant seated in a chair, with a handbag on the floor near her and a man Strede recognized as the defendant leaning over the complainant and hitting her. Strede knew the defendant because they had previously attended the same "AA meetings" in town.

Strede was then questioned about what she observed during the incident while the video footage of the incident was replayed for the jury. Strede first viewed video footage showing her approaching the complainant as she sat in a chair, struggling with the defendant, who was leaning over her. When the video showed the complainant pointing to the handbag on the floor and Strede picking it up and tossing it onto the counter by the cash register, Strede recounted that that had happened as "[the defendant] was mentioning something about keys, and [the complainant] was telling me to grab her purse. And I seen her purse on the floor." Strede was then shown video footage of her exiting the store and talking briefly with the complainant's daughter before reentering the store, approaching the parties, and striking the defendant in the back. Strede explained that she left the store at that time to ask the complainant's daughter to call the police. When the complainant's daughter told her that she had already done so, Strede decided to reenter the store to try to stop the altercation herself before the police arrived by telling the defendant that the police had been called and were on their way to the gas station. She recalled that seconds after she so informed the defendant and struck him in the back, he released the complainant from his grasp, stood up, and walked out of the store, empty-handed. On cross-examination, Strede testified that she knew the defendant had come to the store that day to get some keys, but she did not know which particular keys he was there for.

At the conclusion of Strede's testimony, the state

rested without calling either the complainant or her daughter to testify, whereupon the defendant moved for a judgment of acquittal on all charges except assault in the third degree. The court denied the motion.

The next day, the jury heard testimony from the defendant, who was the only witness called by the defense. He began his testimony by stating that, in 2010, he had been convicted of three felonies. Thereafter, concerning the present incident, the defendant testified that in April, 2017, he was working at a homeless shelter in Willimantic, where his duties included attending to the needs of the guests and making repairs, as needed, around the shelter. Prior to the incident, the defendant said, he had lent one of his vehicles, a truck, to the complainant because her car had recently broken down. The defendant kept the tools he used for making repairs at the shelter in the truck that he had lent to the complainant. On April 3, 2017, however, before the complainant returned the borrowed truck to the defendant, she called him to tell him that "she wasn't coming home." In response to this declaration, the defendant testified that, "I didn't question the reason why. I kinda like just said okay, when you figure out what you're going to do, then you can let me know." Three days later, however, upon returning home from work on April 6, 2017, seeing that the truck he had let the complainant use was still gone and realizing that he needed the tools stored in the truck for work, he called the complainant in an effort to get them back. Because, he explained, the complainant did not return his calls, he "just went to the gas station to retrieve [his] keys."

The defendant testified that, as he walked into the store that afternoon, he asked the complainant about the keys, but she told him that she was not going to give them back to him. This response, he admitted, led to an argument between him and the complainant, during which he physically assaulted her. The defendant denied, however, that he went to the gas station that day intending to assault the complainant or to rob her or steal anything from her. Instead, denying repeated suggestions by the prosecutor to the contrary, the defendant insisted that his only purpose in going to the gas station that day was to get his truck keys from the complainant so that he could retrieve the tools he needed for work from the truck she had borrowed but not yet returned. Additional facts will be set forth as necessary.

I

## THE DEFENDANT'S EVIDENTIARY INSUFFICIENCY CLAIMS

The defendant claims on appeal that the trial court erred in failing to enter judgments of acquittal on the charges of robbery in the third degree and unlawful restraint in the first degree because the evidence at

trial was insufficient to prove each essential element of either charge beyond a reasonable doubt. Because both claims are governed by the same standard of review, we will first set forth that standard.

"In [a defendant's] challenge to the sufficiency of the evidence . . . [w]hether we review the findings of a trial court or the verdict of a jury, our underlying task is the same. . . . We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt. . . . [W]e give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *Adams*, 327 Conn. 297, 304–305, 173 A.3d 943 (2017).

"[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . An appellate court defers to the jury's assessment of the credibility of witnesses on the basis of their firsthand observation of their conduct." (Citation omitted; internal quotation marks omitted.) *State* v. *Thorne*, 204 Conn. App. 249, 256–57, 253 A.3d 1021, cert. denied, 336 Conn. 953, 251 A.3d 993 (2021).

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Adams*, supra, 327 Conn. 305. If we determine that the evidence is insufficient to support the guilty verdict and ultimate conviction, then the defendant is entitled to a judgment of acquittal. See *State* v. *Quintiliano*, 206 Conn. App. 712, 720, 261 A.3d 31, cert. denied, 339 Conn. 918, 262 A.3d 136 (2021).

A

Robbery in the Third Degree

The defendant first argues that the evidence was insufficient to convict him of robbery in the third degree in violation of § 53a-136. Section 53a-136 provides that "[a] person is guilty of robbery in the third degree when he commits robbery as defined in [General Statutes §] 53a-133." Section 53a-133, in turn, provides in relevant part: "A person commits robbery when, *in the course of committing a larceny*, he uses . . . physical force upon another person for the purpose of: (1) . . . over-

coming resistance to the taking of the [person's] property. . . ." (Emphasis added.) Under these statutes, which the state specified in the long form information as its basis for charging the defendant with robbery in the third degree, the defendant could not be convicted of that offense without proof beyond a reasonable doubt, inter alia, that he used physical force on another person while *engaged in the commission of a larceny*.

General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, *with intent to deprive another of property* or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ." (Emphasis added.) In light of this definition, the essential elements of larceny have been held to be "(1) the wrongful taking or carrying away of the personal property of another; (2) *the existence of a felonious intent in the taker to deprive the owner of* [*the property*] *permanently*; and (3) the lack of consent of the owner." (Emphasis added; internal quotation marks omitted.) *State* v. *Adams*, supra, 327 Conn. 305–306. In the present case, where the state based its prosecution of the defendant for robbery in the third degree on his brief seizure of the complainant's handbag in the course of their physical altercation on April 6, 2017, the defendant challenges the sufficiency of the state's evidence to prove that he engaged in such conduct with the intent to deprive the complainant permanently of the handbag.

The defendant testified that he had no such intent, insisting that his only purpose in seizing the handbag during his physical altercation with the complainant was to search it for the keys to the truck he had loaned her so that he could retrieve his work tools from inside the truck. The state responds that the jury reasonably could have discredited the defendant's explanation of his conduct, concluding to the contrary that he took the handbag with the intent to steal it from the complainant, and thus to deprive her of it permanently, because he engaged in a prolonged physical struggle with her to overcome her resistance to its taking and only changed his plan once Strede informed him that the police had been called to the scene and were on their way.

Although it is true that the jury was entitled to reject the defendant's testimony as to his nonlarcenous purpose in taking brief possession of the complainant's handbag in the course of their altercation, it is equally true that the jury was not entitled, on that basis, to draw the contrary inference that his intent at that time was to steal the handbag, and thereby deprive the complainant of it permanently. In *State* v. *Alfonso*, 195 Conn. 624, 490 A.2d 75 (1985), our Supreme Court stated: "While it is true that it is within the province of the jury to accept or reject a defendant's testimony, a jury in rejecting such testimony cannot conclude that the

opposite is true." (Internal quotation marks omitted.) Id., 634. Instead, the court ruled that no such contrary inference could be drawn by the jury "without positive evidence supporting such a conclusion." Id.

In *Alfonso*, where the defendant challenged the sufficiency of the state's evidence to prove that he knowingly possessed marijuana found on premises where he and several others were present at the time of its discovery by the police, our Supreme Court examined the trial court record for any positive evidence, based on the defendant's acts or statements in the surrounding circumstances, that might have supported a reasonable inference that he had such guilty knowledge, despite his denial, at the time of his alleged possession. See id. Upon finding that there was no positive evidence from which the jury reasonably could have drawn a nonspeculative inference that he had such guilty knowledge at the time of his alleged possession of the marijuana, for the marijuana was discovered in a common area, it was not among the defendant's possessions, and there was no evidence that he had smoked marijuana in the past, and another self-incriminating statement he had made about possessing some cocaine found elsewhere on the premises was irrelevant to his alleged possession of marijuana, the court reversed his conviction on that charge. See id., 634–35.

In this case, as in *Alfonso*, the element of robbery in the third degree as to which the defendant claims that the evidence was insufficient to convict him concerns the mental state with which he was acting at the time he allegedly committed that offense. A defendant's mental state is an element that must typically be proved by inference from the defendant's proven words or conduct. See, e.g., *State* v. *Fredrik H.*, 197 Conn. App. 213, 219, 231 A.3d 371 (2020) ("[b]ecause direct evidence of an accused's state of mind typically is not available, his intent often must be inferred from his conduct, other circumstantial evidence and rational inferences that may be drawn therefrom" (internal quotation marks omitted)), cert. denied, 338 Conn. 906, 258 A.3d 1279 (2021). Thus, the state's "positive evidence supporting [the] conclusion" that he acted with that mental state— the intent to deprive the complainant permanently of her handbag—must have consisted of inferences arising either from other statements he was shown to have made at or before the trial or from other conduct he was shown to have engaged in before, during, or after the incident. *State* v. *Alfonso*, supra, 195 Conn. 634.

Here, however, the jury heard no evidence of any statements made by the defendant suggesting that he had a different motive for taking the complainant's handbag during their altercation than that to which he testified, and frequently reiterated on cross-examination, at trial. Apart from such testimony, in which he insisted that his only purpose in coming to the gas

station that day was to get the keys to the borrowed truck and use them to retrieve the work tools he stored in the truck, the only other evidence of statements he made from which any inference of intent might have been drawn were his words, to or in the presence of Strede as he struggled with the complainant, confirming that he had come to the gas station that day to get his keys. Such statements undermined the state's claim that he was then acting with felonious intent. No other evidence was introduced as to any statement he had ever made to anyone, including the complainant or her daughter, expressing any interest on his part in the handbag or its contents, or otherwise giving him a possible motive for stealing it from the complainant. Finally, and tellingly, the complainant's only descriptions of the incident that were ever brought to the attention of the jury were her hearsay statements to the police and to hospital staff that the defendant had attacked or assaulted her inside the store. These descriptions of the defendant's conduct during the incident, however damning on the charges of assault and unlawful restraint, undermined the state's claim against him on the charge of robbery because they made no mention of any alleged effort or purpose on his part to steal the handbag from the complainant in the course of the incident.

Under these circumstances, the only positive evidence from which the jury might have drawn an inference as to the defendant's intent when he seized the complainant's handbag was the video footage of the incident. What the video footage showed, however, was at best unhelpful to the state on that issue. To begin with, it showed that upon entering the store on the day of the incident, the defendant did not go initially to the complainant's handbag, which lay on the rear counter behind her, but to the pink wallet lying at the far end of that counter at that time. When the defendant picked up the wallet and began to look inside it, he was turning away from the counter as if to head back toward the door of the store. Almost immediately, however, he closed the wallet without taking anything from it and returned it to the counter where he had picked it up before reaching behind the complainant toward her handbag. These actions, which are consistent with the defendant's testimony that his only purpose in coming to the gas station that day was to get his truck keys from the complainant so he could retrieve his work tools from the borrowed truck, suggested that if he had found what he was looking for inside the wallet, he would simply have taken it and left the store, for he showed no apparent interest in the wallet itself or in any of its other contents. Only after the defendant had looked inside the wallet and returned it to the counter without removing anything from it did he reach behind the complainant toward the handbag. By reasonable inference, the defendant's search of the handbag, had

he managed to conduct it, would have proceeded in similar fashion to his search of the wallet, with him looking briefly inside it until he found what he was looking for or determined that it was not there, but no longer.

The jury could not infer the defendant's intent from his reach for the handbag because the complainant rose and began to struggle with the defendant as soon as he reached for the handbag, impeding his course. The complainant's strong resistance to his efforts delayed his seizure of the handbag and ultimately prevented him from searching it, for it took him more than twenty seconds to seize the handbag once his struggle with the complainant began, and he held on to it for only eight seconds thereafter before dropping it to the floor. Here again, with no basis in the evidence for inferring that the defendant had any other interest in the handbag or its contents than that to which he testified, the record provided no nonspeculative basis for inferring that his true purpose in seizing it was to steal it, and thus to deprive the complainant of it permanently.

The state further argues, not without reason, that, whatever the defendant intended when he first picked up the handbag appeared to change once Strede struck him in the back and told him that the police had been called to the scene and were on their way. Although that inference is reasonable, it sheds no light on the intent with which the defendant initially took possession of the handbag. Even if he abandoned his struggle with the complainant because he feared that he might be arrested if they came to the gas station, that would reveal nothing about the intent with which he seized the handbag, for regardless of that intent, he had ample reason to believe he might be arrested if the police came to the station because he had just physically assaulted his wife in the presence of multiple witnesses who knew and could readily identify him. Thus, his interest in leaving the scene before the police arrived did not support an inference that he initially took the handbag with the intent to steal it from the complainant and deprive her of it permanently.

In sum, the jury had no reasonable basis in this case for finding that the defendant's brief taking of the complainant's handbag in the course of their physical altercation was accompanied by a felonious intent to steal it from her, and thus to deprive her of it permanently. In the absence of positive proof that he acted with that intent, there was insufficient evidence to support the jury's necessary finding that he seized the handbag in the course of committing a larceny, as required to convict him of robbery in the third degree.

B

Unlawful Restraint in the First Degree

The defendant next argues that the evidence was

insufficient to convict him of unlawful restraint in the first degree in violation of § 53a-95. Section 53a-95 (a) provides: "A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury." So written, § 53a-95 requires proof beyond a reasonable doubt of two essential elements before a defendant can be convicted of unlawful restraint in the first degree: first, that the defendant restrained another person; and second, that he did so under circumstances exposing the other person to a substantial risk of physical harm. The defendant claims that the state failed to establish either such essential element beyond a reasonable doubt.

As used in § 53a-95, the term "restrain" is defined by statute to mean "to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent." General Statutes § 53a-91 (1). This element requires proof not only that the defendant actually restricted the complainant's movements in such a manner as to interfere substantially with her liberty, without her consent, but that he did so intentionally, that is, with the "conscious objective" of causing that result. General Statutes § 53a-3 (11). Here again, we note that, "[b]ecause direct evidence of an accused's state of mind typically is not available, his intent often must be inferred from his conduct, other circumstantial evidence and rational inferences that may be drawn therefrom. . . . For example, intent may be inferred from the events leading up to, and immediately following, the conduct in question . . . the accused's physical acts and the general surrounding circumstances." (Internal quotation marks omitted.) *State* v. *Fredrik H.*, supra, 197 Conn. App. 219.

A person restrains another under circumstances exposing her to a substantial risk of physical injury when his intentional and unlawful restriction of her movements in the manner specified in § 53a-95 exposes her to a substantial risk of suffering "impairment of physical condition or pain," as physical injury is defined in § 53a-3 (3). Although a person shown to have been restrained within the meaning of § 53a-91 (1) need not be shown to have suffered actual physical injury as a result of such restraint to establish this second element of unlawful restraint in the first degree, proof that the restraint did in fact cause her to suffer physical injury is sufficient to establish that she was restrained under circumstances exposing her to a substantial risk of such injury. See *State* v. *Jordan*, 64 Conn. App. 143, 148, 781 A.2d 310 (2001) ("jury finding of actual physical injury encompasses the statutory requirement of mere exposure to physical injury necessary to obtain a conviction

of unlawful restraint in the first degree").

In this case, the state sought to prove that the defendant restricted the complainant's movements in such a way as to interfere substantially with her liberty during their physical altercation on April 6, 2017, and thereby restrained her, by forcing her down into a chair, leaning over her, striking her repeatedly, and forcing her to remain in the chair as their struggle continued. The defendant disagrees, contending that the evidence fails to show that he restrained the complainant, intentionally or otherwise, at any time. To the contrary, he claims, she is the one who restrained him, for video footage of the altercation assertedly shows that she initiated the physical struggle between them when he first reached for her handbag, she put him in a headlock and held him up against a wall as they stood next to one another and continued to struggle, and once she was sitting in the chair, she grabbed him and held him down with her arms and legs until the incident ended. Claiming that the complainant both had and made use of the opportunity to strike and to hold onto him during the incident, the defendant argues that her movements were essentially unrestricted by his proven conduct.

Considering the evidence in the light most favorable to sustaining the jury's guilty verdict, we agree with the state that there was more than enough evidence to support the jury's findings beyond a reasonable doubt that the defendant restrained the complainant during their physical altercation on April 6, 2017, and that he thereby exposed her to a substantial risk of physical injury. To begin with, the complainant's statements to Sullivan and the hospital staff were that the defendant had attacked or assaulted her. She further told the staff at the hospital that the defendant had punched her and caused her to fall into a chair, where he kneed her and kicked her in the head. Although no witness other than the defendant testified to what happened in the first part of the parties' altercation, Strede testified, and the video corroborated her testimony, that, after the complainant was seated in the chair, the defendant continued to lean over her and to strike her, causing her to remain in the chair when she attempted to get up. This testimony reasonably could have supported a finding by the jury that, at least by the time the complainant was sitting in the chair, the defendant was intentionally preventing her from standing up and getting away from him, thereby restricting her movements in a way that interfered substantially with her liberty. Although the defendant may also have had other purposes in mind when he was restricting the complainant's physical movements at that time, it would have been reasonable for the jury to conclude that he engaged in such conduct with the specific intent to interfere substantially with her liberty. See *State* v. *Fredrik H.*, supra, 197 Conn. App. 219 (holding that defendant's actions designed to accomplish purposes other than restraining another

person may be sufficient to establish intent element of unlawful restraint if he is shown to have engaged in such actions with specific intent to interfere substantially with other person's liberty).

With respect to the defendant's suggestion that his altercation with the complainant involved only mutual combat, where she restrained him as much as he restrained her, the video footage reasonably could have been found to show, as Strede testified, that the defendant assaulted the complainant and leaned over her to keep her down once she was seated in the chair. Here, then, as in *State* v. *Luster*, 48 Conn. App. 872, 713 A.2d 277, cert. denied, 246 Conn. 901, 717 A.2d 239 (1998), in which a similar claim of innocence was made by a defendant whose alleged victim was able to struggle with and resist him despite his efforts to force her down on a bed, "[t]he jury . . . reasonably could have concluded that the victim was restricted in her movements in a manner that interfered with her liberty." Id., 881.

Finally, as to the defendant's suggestion that any restraint he might have applied to the complainant was not applied in such circumstances as to expose her to a substantial risk of physical injury, that suggestion must be rejected for several reasons, not the least of which is the defendant's own admission that he assaulted the complainant in the course of the incident.[4] See *State* v. *Cotton*, 77 Conn. App. 749, 776, 825 A.2d 189 ("evidence of the defendant's assault on the victim in the parking lot was ample to support a factual determination that by his behavior, the defendant exposed the victim to a substantial risk of physical injury"), cert. denied, 265 Conn. 911, 831 A.2d 251 (2003). In addition to the defendant's own admission, the state presented evidence that included the hospital record documenting the complainant's injuries, the video footage showing that he physically struggled with the complainant for more than one minute, and Strede's account of the several times he kneed the complainant while she was forced to remain sitting in the chair. The jury reasonably could have concluded from this evidence that the defendant restrained the complainant under circumstances that exposed her to a substantial risk of physical injury.

On the basis of the foregoing, the evidence was sufficient to support the defendant's conviction of unlawful restraint in the first degree.

II

THE DEFENDANT'S EVIDENTIARY AND

CONFRONTATION CLAUSE CLAIMS

The defendant's additional claims of error concern the court's admission of hearsay testimony from Sullivan concerning the nontestifying complainant's initial oral statement to him, in which she accused the defendant of attacking her.

## A

### Evidentiary Challenge to Admissibility of Complainant's

### Initial Oral Statement to Police

### As a Spontaneous Utterance

We first address the defendant's claim that the challenged statement was improperly admitted as a spontaneous utterance, over his timely hearsay objection, under § 8-3 (2) of the Connecticut Code of Evidence. The state disagrees, asserting that the statement was properly admitted under the spontaneous utterance exception to the rule against hearsay and that, even if its admission on that basis was erroneous, that error does not require reversal of his conviction because the defendant has failed to establish that the statement was harmful to his defense. We agree with the state.

We begin by setting forth the relevant standard of review. "As a general rule, hearsay is inadmissible unless an exception from the Code of Evidence, the General Statutes or the rules of practice applies. . . . To the extent a trial court's admission of evidence is based on an interpretation of the [Connecticut] Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. They require determinations about which reasonable minds may not differ; there is no judgment call by the trial court . . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Vega*, 181 Conn. App. 456, 463–64, 187 A.3d 424, cert. denied, 330 Conn. 928, 194 A.3d 777 (2018).

"An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies. . . . Among the recognized exceptions to the hearsay rule is the spontaneous utterance exception, which applies to an utterance or declaration that: (1) follows some startling occurrence; (2) refers to the occurrence; (3) is made by one having the opportunity to observe the occurrence; and (4) is made in such close connection to the occurrence and under such circumstances as to negate the opportunity for deliberation and fabrication by the declarant. . . . [T]he ultimate question is whether the utterance was spontaneous and unreflective and made under such circumstances as to indicate absence of opportunity for contrivance and misrepresentation. . . . Whether an utterance is spontaneous and made under circumstances that would preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge. . . . The trial judge exercises broad discretion in deciding

this preliminary question, and that decision will not be reversed on appeal absent an unreasonable exercise of discretion." (Internal quotation marks omitted.) *State* v. *Pugh*, 176 Conn. App. 518, 523–24, 170 A.3d 710, cert. denied, 327 Conn. 985, 175 A.3d 43 (2017), quoting *State* v. *Wargo*, 255 Conn. 113, 127–28, 763 A.2d 1 (2000); see also Conn. Code Evid. § 8-3 (2).

Here, the defendant claims that the record was insufficient to establish that the complainant was under the stress or excitement caused by the incident when she gave the statement to the police. He bases this claim on the state's alleged failure to establish either the exact time at which the statement was made in relation to the end of the complainant's physical altercation with him or the exact circumstances in which the complainant made the challenged statement, particularly, whether the statement was made spontaneously, without prompting, in the immediate aftermath of the incident, or made more self-reflectively, in response to less immediate, nonemergency police interrogation. We conclude that the record clearly supports the trial court's finding that the statement was made spontaneously and that the defendant has not demonstrated how that ruling was an "unreasonable exercise of discretion." (Internal quotation marks omitted.) *State* v. *Pugh*, supra, 176 Conn. App. 524. This is because, although the record does not establish exactly how much time elapsed between the end of the incident mentioned in the statement and the making of the statement, the state presented ample evidence, through the testimony of Sullivan, to demonstrate that the complainant was still under sufficient emotional stress resulting from the incident at the time she made the statement as to make it unlikely that the statement was the product of contrivance or misrepresentation on her part.[5] As described by Sullivan when she first spoke to him, the complainant "appeared in distress, her hair was a mess, she appeared to be crying, she was breathing heavy. . . . [S]he appeared to be in a stressful situation prior and she was just breathing heavy, a little anxious, very emotional."

On the basis of the evidence presented, it was reasonable for the court to conclude that the complainant's statement to Sullivan was a spontaneous utterance. Not only was the complainant "in distress" and "very emotional" when she first spoke with Sullivan, but she made her initial oral statement to him shortly after he arrived at the gas station at 3:36 p.m., roughly three minutes after the defendant released her from his grasp and drove away. Additionally, the fact that the complainant arrived at the hospital at 4:02 p.m. and later gave a fuller, more detailed statement regarding the events at the gas station shows that her initial statement to Sullivan "was spontaneous and unreflective and made under such circumstances as to indicate absence of opportunity for contrivance and misrepresentation." (Internal quotation marks omitted.) *State* v. *Pugh*, supra, 176

Conn. App. 523.

Even if we were to assume, however, that the trial court erred in admitting the complainant's initial oral statement as a spontaneous utterance, the defendant would not be entitled to a new trial on that basis, for he has failed to demonstrate that admission of the statement, allegedly a nonconstitutional evidentiary error, substantially affected the verdict. See, e.g., *State* v. *Edwards*, 325 Conn. 97, 133, 156 A.3d 506 (2017) (defendant bears burden of demonstrating nonconstitutional evidentiary error was harmful). "Whether the error was harmless depends on a number of factors, such as the importance of the evidence to the state's case, whether the evidence was cumulative of properly admitted evidence, the presence or absence of corroborating evidence, and, of course, the overall strength of the state's case." *State* v. *Culbreath*, 340 Conn. 167, 192, 263 A.3d 350 (2021). Although the complainant's challenged statement identified the defendant by name and generally described his actions at the gas station as an attack, there was overwhelming additional evidence that proved those facts as well. The complainant's statement merely corroborated the defendant's own admission that he had assaulted the complainant at the station, as well as the other unchallenged evidence, such as the video footage of the entire incident that showed the defendant's conduct throughout the incident. On the basis of the defendant's unqualified admission of the assault, and the state's overwhelming evidence confirming that admission, any error in admitting the complainant's initial oral statement was clearly harmless.

B

The Defendant's Confrontation Clause Claim

Finally, we turn to the defendant's constitutional claim that admission of the nontestifying complainant's initial oral statement to the police accusing him of attacking her violated his sixth and fourteenth amendment rights to confront the witnesses against him because he never was afforded the opportunity to cross-examine her about that statement, either before or during trial. The defendant concedes, as he must, that this claim was not preserved at trial, and thus he requests that we review it under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). In response, the state asserts that the defendant's claim should not be reviewed under *Golding* because the record does not clearly establish that the statement was testimonial in nature and thus that its admission without affording him the opportunity to cross-examine the complainant constituted a constitutional violation, and, even if admission of the statement in these circumstances constituted a constitutional violation, that violation should not result in reversal of the defendant's conviction because it was harmless beyond a reasonable doubt in

light of the abundance of other evidence, including the defendant's own admission, that he assaulted the complainant at the gas station in Willimantic on April 6, 2017.

It is well established that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances. . . . [T]he first two [prongs of *Golding*] involve a determination of whether the claim is reviewable . . . and under those two prongs, [t]he defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. . . . [T]he second two [prongs of *Golding*] . . . involve a determination of whether the defendant may prevail." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Vega*, supra, 181 Conn. App. 484–85. Consistent with this approach to analyzing the appropriateness of reviewing an unpreserved constitutional claim under *Golding*, we will first determine if, under the fourth prong of *Golding*, the state has demonstrated that any constitutional error that may have resulted from the admission of the nontestifying complainant's initial oral statement to the police was harmless beyond a reasonable doubt.

"[W]hether a defendant is entitled to any remedy for a violation of his right to confront witnesses depends on whether the violation is legally harmless." Id., 485. "It is well established that a violation of the defendant's right to confront witnesses is subject to harmless error analysis . . . ." (Internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 512, 180 A.3d 882 (2018); see also *State* v. *Pugh*, supra, 176 Conn. App. 528–30 (conducting harmless error analysis to resolve confrontation clause claim).

"[T]he test for determining whether a constitutional [error] is harmless . . . is whether it appears beyond a reasonable doubt that the [error] complained of did not contribute to the verdict obtained. . . . [Our Supreme Court] has held in a number of cases that when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt. . . . [W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had

a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]. . . . Additional factors that we have considered in determining whether an error is harmless in a particular case include the importance of the challenged evidence to the prosecution's case, whether it is cumulative, the extent of cross-examination permitted, and the presence or absence of corroborating or contradicting evidence or testimony." (Citations omitted; internal quotation marks omitted.) *State* v. *Edwards*, 334 Conn. 688, 706–707, 224 A.3d 504 (2020).

As previously noted, it is significant to our analysis that the complainant's out-of-court statement accusing the defendant of attacking her did not serve as an integral portion of the state's case against the defendant. Instead, the role it served was merely cumulative, for it was corroborated not only by the video footage of the entire incident, which clearly showed the defendant striking the complainant, and by records from the hospital documenting her resulting physical injuries, but also by Strede's independent description of the assault and identification of the defendant as the perpetrator and, importantly, the defendant's own admission of the assault. See *State* v. *Smith*, 289 Conn. 598, 628–29, 960 A.2d 993 (2008) (concluding that admission of statement, even though improper, was ultimately harmless error because statement was cumulative). In light of this evidence, which overwhelmingly supported the state's claim that the defendant assaulted the complainant in the course of their physical altercation on April 6, 2017, the state never mentioned the complainant's challenged statement in its closing argument to the jury. For all of these reasons, we conclude that, even if the admission of the complainant's statement to Sullivan violated the defendant's constitutional right to confrontation, any error in its admission was harmless beyond a reasonable doubt. See *State* v. *Edwards*, supra, 334 Conn. 713. Therefore, the defendant's claim fails under *Golding*'s fourth prong.

### III

### CONCLUSION

We agree with the defendant that the evidence was insufficient to sustain his conviction of robbery in the third degree. Accordingly, we reverse his conviction on that charge and remand this case to the trial court with direction to enter a judgment of acquittal thereon. We disagree with the defendant, however, as to his other claims of error, and thus affirm the challenged judgment in all other respects.

The judgment is reversed as to the conviction of robbery in the third degree and the case is remanded with direction to enter a judgment of acquittal on that

charge; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the complainant or others through whom the complainant's identity may be ascertained. See General Statutes § 54-86e.

[1] The defendant's separate concurrent sentences on the three underlying charges of which the jury found him guilty, as enhanced, where appropriate, by the jury's guilty verdict on the part B information, were as follows: on the charge of robbery in the third degree, a term of three years of imprisonment; on the charge of unlawful restraint in the first degree, a term of six years of imprisonment followed by four years of special parole; and on the charge of assault in the third degree, a term of three years of imprisonment.

[2] The defendant objected to the admission of this statement on the grounds that it was hearsay and lacked foundation. The state argued that the complainant's statement to Sullivan was a spontaneous utterance, and the court overruled the defendant's objection.

[3] As the complainant and the defendant are married, the complainant's daughter is also the defendant's stepdaughter.

[4] When the defendant testified at trial, the following colloquy took place on direct examination:

"Q. Tell us what occurred, what happened in the—at—what we saw in the video.

"A. When I got to the gas station, me and my wife we ended up getting into an argument and then we ended up getting into an altercation and I ended up hitting my wife.

"Q. So you did in fact assault her?

"A. Yes, I did."

[5] "[T]here is no identifiable discrete time interval within which an utterance becomes spontaneous; [e]ach case must be decided on its particular circumstances." (Internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 375, 908 A.2d 506 (2006); see *State* v. *Slater*, 285 Conn. 162, 179–80, 939 A.2d 1105 (despite it being unclear how much time had passed, victim's emotional state, appearing visibly shaken, supported court's finding that statement was spontaneous utterance "made under circumstances that had negated the opportunity for deliberation or fabrication"), cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008).